1  Richard C. Eymann, WSBA #7470
   EYMANN ALLISON HUNTER JONES P.S.
2  2208 W. Second Avenue
   Spokane, Washington 99201
3  Telephone:  (509) 747-0101
   Facsimile:    (509) 458-5977
4  E-mail:        eymann@eahjlaw.com

5  Hugh P. Lambert
   Emily C. Jeffcott
6  Cayce C. Peterson
   THE LAMBERT FIRM, PLC
7  701 Magazine Street
   New Orleans, Louisiana 70130
8  Telephone:  (504) 581-1750
   Facsimile:    (504) 529-2931
9  E-mail:        hlambert@thelambertfirm.com
                  ejeffcott@thelambertfirm.com
10                cpeterson@thelambertfirm.com

11 *Attorneys for Relators*

12            **UNITED STATES DISTRICT COURT**

13          **EASTERN DISTRICT OF WASHINGTON**

14

15 | UNITED STATES OF AMERICA | CIVIL ACTION NUMBER:. |
   | *EX REL.* MICHAEL B. GEFFRE. | **CV-13-5074-RMP** |
16 | | DISTRICT JUDGE: |
17 | RELATOR, | |
18 | | |
19 | | **COMPLAINT** |
20 | VS. | **FILED UNDER SEAL** |

21

1

| | |
|---|---|
| 1  WASHINGTON RIVER | DEMAND FOR JURY TRIAL |
| 2  PROTECTION SOLUTIONS LLC, | |
| 3  URS CORPORATION, | |
| 4  ENERGY*SOLUTIONS* FEDERAL | |
| 5  SERVICES OF HANFORD, INC. | |
| 6 | |
| 7  DEFENDANTS. | |

# TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY OF ALLEGATIONS ......................4

II.   PARTIES ..................................................................6

III.  JURISDICTION AND VENUE ...............................................9

IV.   FACTUAL ALLEGATIONS ..................................................10

      A.    BACKGROUND: A CENTURY OF HANFORD ...........................10

            1.    Beginnings: A Nuclear Facility at Hanford ...............10

            2.    Chemical Waste Storage .........................................10

            3.    Federal and State Government Work To Prevent Harms
                  Associated with Wastes ..........................................12

      B.    The 2011 Detection of a Leak in Tank AY-102 .................13

      C.    Defendants Lie To DOE About the Leaking Tank AY-102 ..............15

      D.    Defendants Withhold Evidence of the Leak and Delay Videotaping of
            Tank AY-102 in Order to Enhance PBI Awards .................18

V.    COUNT I - False Claims Act, 31 U.S.C. § 3729 (a)(1) & (2) .....................23

VI.   COUNT II - False Claims Act, Conspiracy...................................24

VII.  DAMAGES...................................................................25

VIII. JURY REQUEST ...........................................................25

IX.   PRAYER FOR RELIEF .......................................................25

## I.   INTRODUCTION AND SUMMARY OF ALLEGATIONS

1.      This is an action to recover damages, civil penalties, and other relief from Washington River Protection Solutions LLC, URS Corporation, and Energy*Solutions* Federal Services of Hanford, Inc., (collectively, "Defendants") for causing great harm to the United States by misrepresenting to the United States the existence of a leak in nuclear and chemical waste-holding Tank AY-102 in order to falsely claim monies related to design, construction and procurement work and awards for performance-based measures.

2.      Tank AY-102 is a 1 million gallon, double-shell radioactive waste holding tank, currently used to store high-level radioactive and chemical wastes, referred to as mixed waste, at the Hanford Site, a one-time nuclear production complex that is in the process of being decommissioned.  Double-shell tanks, including AY-102, consist of a primary (inner) steel tank within a secondary (outer) steel liner, together the layers are surrounded by a reinforced concrete structure.

3.      Tank AY-102 is a uniquely designed tank that holds the most dangerous chemical and nuclear wastes in the Hanford Tank Farm.  Subsequent construction, Tank AY-102 was selected to serve as the holding tank for wastes that are to be transferred from the Tank Farm to the Hanford Waste Treatmeant and Immobilization Plant ("WTP") for vitrification.  In approximately 2009, the

United States Department of Energy ("DOE") directed Defendants to upgrade Tank AY-102 to serve this purpose.

4.    On October 10, 2011, Relator Geffre identified a leak in Tank AY-102.

5.    Tank leaks at the Hanford Tank Farm must be immediately reported to DOE.  Once a tank is deemed to be leaking, the tank is declared inoperable by Department of Ecology for the State of Washington ("Ecology") and wastes contained within the leaking tank are required to be removed by a timetable agreed upon by DOE and Ecology.

6.    Relator Geffre told Defendants that Tank AY-102 appeared to be malfunctioning and leaking highly contaminated wastes.  Defendants failed to take immediate investigative or remediative action to address Relator's concerns.  Instead, Defendants took action to cover-up the existence of the leak.

7.    Despite knowing that a leak in Tank AY-102 would preclude it from serving as the holding tank for wastes to be transferred to the WTP, Defendants continued their design efforts to upgrade Tank AY-102 for this purpose, claiming payment for design work, construction efforts and procurements.  Defendants also claimed award payment from DOE for performance measures related to nuclear safety, environment, radiological safety, work control process and control of

operations, emergency preparedness, among others, while hiding from DOE the existence of the leak in AY-102.

8.     Defendants waited over a year, until after the close of the fiscal year, to acknowledge the Tank AY-102 leak on October 22, 2012. Even after conceeding that AY-102 was leaking, Defendants chose to continue fieldwork on AY-102, forcing the DOE to issue a formal stop work order on November 14, 2012.

9.     As a result of the Defendants false claims and misrepresentations, Defendants have fraudulently billed and received payment for at least $20 million in costs and award payments, as billed to the United States government and tax payers.

**II.   PARTIES**

10.     Defendant Washington River Protection Solutions LLC ("WRPS") is a limited liability corporation and joint venture between URS Corporation ("URS") and Energy*Solutions* Federal Services of Hanford, Inc. ("Energy*Solutions*"). WRPS conducts business in Washington State, providing services transferring radioactive, nuclear waste from single-shell tanks into newer double-shell tanks where it is stored until prepared for disposal.  WRPS is incorporated under the laws of the state of Delaware with its home office at 2440 Stevens Center Place, Richland, Washington 99354.  WRPS may be served with process through its

registered agent, C T Corporation System, at 505 Union Avenue SE, Suite 120, Olympia, Washington 98501.

11.     Defendant URS Corporation is a foreign corporation doing business in Washington State and the United States.  URS is the owner and operator of a worldwide vertically integrated business specializing in the provision of construction, technical, and engineering related services for public and private sector agencies and enterprises throughout the world.  These services include, but are not limited to: program management; planning, design and engineering; systems engineering and technical assistance; information technology; construction and construction management; operations and maintenance; and decommissioning and closure services.  URS conducts such businesses in Washington and the United States through a number of subsidiaries, including WRPS. URS partnered with Energy*Solutions* to create WRPS, and together they were awarded the Tank Operations Contract, Contract No. DE-AC27-08RV14800, by the DOE.  Under this contract and the joint venture between Defendants URS and Energy*Solutions*, the WRPS is responsible for tank waste mission activities at Hanford. URS is incorporated under the laws of the state of Nevada with its home office at 600 Montgomery Street, 26th Floor, San Francisco, California 94111. Defendant URS Corporation may be served with process through its registered agent, C T Corporation System, at 505 Union Avenue SE, Suite 120, Olympia, Washington

98501.

12.     Defendant Energy*Solutions* Federal Services of Hanford, Inc. is an international nuclear services company conducting business in Washington, across the United States, and abroad.  Energy*Solutions* offers services dealing with the decommissioning and remediation of nuclear sites and facilities, management of spent nuclear fuel or waste, transportation of nuclear material, and environmental cleanup of nuclear legacy sites.   Energy*Solutions* conducts such businesses in Washington and the United States through a number of subsidiaries, including WRPS.  Energy*Solutions* partnered with URS to create WRPS, and together they were awarded the Tank Operations Contract, Contract No. DE-AC27-08RV14800, by the DOE.   Under this contract and the joint venture between Defendants Energy*Solutions* and URS, the WRPS is responsible for tank waste mission activities at Hanford.  Energy*Solutions* is incorporated under the laws of the state of Delaware with its home office located at 423 West 300 South Suite #200, Salt Lake City, Utah 84101.  Energy*Solutions* may be served with process through its registered agent, Corporation Service Company, at 300 Deschutes Way SW Suite 304, Tumwater, Washington 98501.

13.     Relator Michael B. Geffre is the Lead Instrument Specialist for the AY/AZ Tank Farm at Hanford.  Relator Geffre is currently employed by WRPS and has been since May 13, 1987.  Relator Geffre is a qualified Hazardous Worker,

Radiation Worker, Electrical Worker, and a trained Field Work Supervisor. Relator Geffre has direct and independent knowledge of the information underlying his claims as set forth in this Original Complaint, and he voluntarily provided all such information to the United States government before public disclosures or the filing of this Original Complaint. In February of 2013, Relator Geffre contacted United States Senator Patty Murray through her website, raising his concerns about the material misrepresentations made by Defendants in their assessment of Tank AY-102. The information possessed by Relator Geffre and provided to the United States government materially adds to publically disclosed allegations and transactions. As such, pursuant to 31 U.S.C. § 3730(e)(4)(B), Relator Geffre is an "original source" of the information underlying and becoming Relator's false claims identified herein.

**III.   JURISDICTION AND VENUE**

14.    This action arises under the United States False Claims Act, 31 U.S.C. § 3729 et seq.

15.    This Court has jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

16.    Venue is proper with respect to all parties in the United States District Court for the Eastern District of Washington pursuant to 28 U.S.C. § 1391(b), (c) and 31 U.S.C. § 3732(a) because all Defendants transact business in this District

and because Relator, during all times material to this matter, were employed in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    BACKGROUND: A CENTURY OF HANFORD

17.    Nuclear operations began at the Hanford Site in approximately 1943. At least a century will pass before the WTP is capable of immobilizing mixed waste resulting from past nuclear operations.

#### 1.    *Beginnings: A Nuclear Facility at Hanford*

18.    The Hanford Site was established as part of the Manhattan Project and was home to the first full-scale plutonium reactor in the world—the B Reactor. The bomb dropped on Nagasaki, Japan contained plutonium manufactured at Hanford.

19.    Over the course of 45 years, a total of nine plutonium production reactors and six large processing facilities were built allowing the Hanford Site to produce the plutonium for the majority of weapons in the U.S. nuclear stockpile. The weapons production reactors have been in the decommissioning process since the Cold War.

#### 2.    *Chemical Waste Storage*

20.    The decades of plutonium manufacturing resulted in about 56 million gallons of high-level radioactive and chemical wastes, referred to as "mixed

waste".  Over time, 177 large tanks, ranging in capacity from 55,000 gallons to more than 1,000,000 gallons, were constructed to house the waste.  One hundred and forty-nine of these tanks are single shell and were built at the Hanford "Tank Farm" between 1943 and 1964.  The remaining 28 were built between 1968 and 1986 with double shells.  These tanks are also located at the Tank Farm.

21.    Single-shell tanks are made of a carbon steel liner encased in a reinforced-concrete structure.  The steel liner only extends to a specific height above the maximum liquid level within the tank.  A layer of grout and a waterproofing membrane separate the steel liner from its concrete casing structure.  The single-shell tank headspace is enclosed by reinforced concrete.  Single-shell tanks were not designed with a secondary containment.  A secondary containment serves to detect and contain any potential leaks.

22.    Double-shell tanks consist of a primary carbon steel tank surrounded by a secondary carbon steel liner, both encased by a reinforced-concrete structure.  The primary, inner most tank sits atop an insulating concrete slab so as to provide for air circulation, physical separation from the outer liner, and to allow for leak detection beneath the bottom of the primary tank.  Between the primary tank shell and the secondary tank shell liner, there is an annular space of two and a half feet to allow for visual examination of the tank wall and secondary liner surfaces as well as allowing for ultrasonic volumetric inspections.

23.    Double-shell tanks were built to replace leaking or malfunctioning/failing single-shell tanks that are well beyond their design life. Double-shell tanks were designed with the ability for leak detection and containment within the annular space between the primary tank and its outer liner.

24.    Tank AY-102 is one of two double shell tanks in the 241-AY Tank Farm.

### 3.    Federal and State Government Work To Prevent Harms Associated with Wastes

25.    Seeking to correct and prevent further damage from the mixed waste contaminating the Hanford Site and migrating into the water table and Columbia River, the United States Environmental Protection Agency ("EPA"), DOE, and Ecology signed a comprehensive cleanup and compliance agreement in 1989. The agreement, known as the "Tri-Party Agreement," eventually became a Consent Decree following litigation.

26.    The Consent Decree requires and serves the purpose of bringing the Hanford site, including the Tank Farm, into compliance with existing federal and state environmental laws that govern the management and cleanup of hazardous wastes and hazardous waste sites.

27.    The Consent Decree includes numerous mandatory milestones that the DOE must achieve in order to remain compliant with the legally binding

agreement.   One such category of milestones pertains to the removal and immobilization of the mixed waste from the Tank Farm.  To accomplish this, DOE decided to vitrify the waste, just as has been done at other nuclear waste treatment facilities across the world. Vitrification would take place at the to-be constructed Hanford Waste Treatment and Immobilization Plant ("WTP").

28.    Prior to being sent to the WTP for vitrification, a double shell tank located in the AY Tank Farm, Tank AY-102, was selected as the transfer and holding receptacle for the waste feed.  In that function, Tank AY-102 would serve as the middleman for wastes received from AY/AZ tanks passing through to the WTP.

29.    In 2010, DOE directed Defendants to modify the design and upgrade Tank AY-102 to serve this function, resulting in an increased scope of work valued at approximately $100,000,000.00 over 2011-2012.

**B.    The 2011 Detection of a Leak in Tank AY-102**

30.    Tank AY-102 is equipped with ENRAF leak detection instrumentation that has been demonstrated to accurately detect $^{1}/_{100}$ inch of liquid accumulation.  This instrumentation is attached to risers that take measurements at various locations in the annulus of Tank AY-102 and are set to alarm upon the detection of ¼ inch of liquid accumulation.

31.   On October 9, 2011, the ENRAF instrumentation installed on Riser 90 in Tank AY-102 detected a leak in the annulus, with material accumulating to a height of 0.51 inches from the annulus floor, and triggered an alarm, generating a recorded history of the event.

32.   The next day, Relator Geffre was told of the ENRAF alarm and was directed to investigate whether the ENRAF instrument was in working order and the existence of a leak.

33.   At that time, Kelly Smith, the Day Shift Manager, told Relator Geffre that he wanted the ENRAF instrument to be declared inoperable. Relator Geffre recommended that prior to removing the instrument from service, the instrument should be first verified as inoperable.

34.   Accompanied by Health Physics Technician, Jan Schaeffer, Relator Geffre proceeded to Tank AY-102 with a Portable Electronic Transmitter ("PET"). Upon inspection of the Riser 90 ENRAF instrument, Relator Geffre determined it to be in proper working order. Relator Geffre verified that the AY-102 ENRAF alarm that sounded the previous day indicated a high leak alarm (one greater than 0.25 inches). Relator Geffre then determined the leak depth to be 0.51 inches. Relator Geffre later learned that the ENRAF instrument was declared inoperable despite his findings to the contrary.

35.     Relator Geffre reported his findings to Kelly Smith and requested to raise the plummet, the piece of instrument touching the waste, in order to check for contamination.   After receiving Smith's permission, Relator Geffre raised the plummet into the sight glass while Jan Schaefer used her Geiger Meter to read for any contamination.  Large amounts of contamination were detected.  Ms. Schaefer then used a RO-20, a device used to detect the human effects of radiation dose, and found contamination levels of 5 mrem.   Readings over 1 mrem raise extreme health concerns. A RO-20 contamination and dose rate reading had never been recorded from an ENRAF annulus plummet.

36.     The RO-20 radiation levels on the plummet and the presence of 0.51 inches of contaminated waste accumulation, confirmed a leak in the annulus of Tank AY-102.

**C.     Defendants Lie To DOE About the Leaking Tank AY-102**

37.     On October 10, 2011, Relator Geffre reported his findings in a meeting at which Defendants' personnel were in attendance, including Randy Hoover, Field Work Supervisor; Dave Strasser, Area Manager; Mark Lutz, Relator Geffre's supervisor; and Kelly Smith, Day Shift Manager.  During this meeting, Mr. Smith contacted Defendants' Environmental Compliance Officer and the DOE in order to explain, but not confirm, the alarm.

38.    Approximately 15-30 minutes later, Relator Geffre overhead Dave Strasser explaining to DOE that rainwater from the previous evening's storm had intruded the annulus and given a false alarm on the ENRAF.

39.    Tank leaks at the Hanford Tank Farm must be immediately reported to DOE.  Once a tank is determined to be leaking, the tank is declared inoperable by Ecology and wastes contained within the leaking tank are required to be removed by a timetable agreed upon by DOE and Ecology.

40.    Relator Geffre was not present in Defendants' meeting with DOE representatives, but overheard the rainwater assertions by Defendants' representatives.  As DOE representatives were exiting the meeting, Relator Geffre approached DOE representative, stating something along the lines of "the problem is more serious than rainwater."

41.    Relator Geffre and other employees of Defendants, including Jan Schaeffer, Alicia Gallher, and Larry Martinez, did not believe rainwater intrusion to be the source of the alarm because:

        a.    Contamination levels were detected where none should have been—there had been no previous contamination since 1999;

        b.    Equipment removed from the annulus risers had historically been contamination free;

c.      Previous water accumulation in AY-102 had been traced to a punctured pipe in 1986 and had been corrected;

d.      Rainwater accumulation in AY-102 had never been demonstrated;

e.      Rainwater intrusion issues were primarily, if not only, limited to single shell tanks; and

f.      Rainwater intrusions associated with the Tank Farm had been eliminated in 2008 with actions taken and maintained to prevent future rainwater intrusions.

42.    It was recommended that the annulus be evaluated using a camera. This recommendation was ignored.

43.    Relator Geffre was then directed on October 12, 2011 to check the calibration of the ENRAF instrumentation again.  Relator Geffre again confirmed that the instrument was in proper working order.

44.    Due to the accumulation of radioactive waste on the plummet, Relator Geffre was directed to flush the ENRAF to clear the plummet of waste on October 24, 2011.  Prior to flushing, the RO-20 instrument readings of the plummet were 5 mrem.  Following the flush, the RO-20 readings from the plummet were 1.5 mrem, again confirming the existence of waste.

45.    As a result of the flushing activities, the waste on the floor of annulus was disturbed and sufficient air born material reached the Continuous Air Monitor ("CAM") to trip the alarm.  Five days prior to the leak, a CAM sample was within normal limits.  The fan on the CAM was then shut off to turn off the alarm, and two days later, the CAM alarm ceased.

46.    Under direction from maintenance manager, Mark Lutz, Dave Strasser, and facility engineer, Kevin Hull, Relator Geffre was then directed to recalibrate and reset to zero the ENRAF instrument, erasing historical readings and reducing the chance of subsequent alarms.   Under protest, Relator Geffre recalibrated the instrument but confirmed prior that the instrument was in proper working order.

47.    Despite knowing—and hiding from DOE—the existence of a leak, Defendants continued to expend dollars upgrading Tank AY-102 for use in the Tank Farm-WTP waste transfer.

**D.    Defendants Withhold Evidence of the Leak and Delay Videotaping of Tank AY-102 in Order to Enhance PBI Awards**

48.    On March 10, 2012, the ENRAF plummet became stuck to the annulus floor by leaked waste, rendering the instrumentation inoperable.   The instrument was then taken out of service.

49.     In repairing the ENRAF instrumentation, Relator Geffre and other Defendants' engineers found high levels of contamination on the plummet wire, which is attached to the plummet as it is lowered into the annulus. The plummet in its entirety was never retrieved and remains stuck to the annulus floor.

50.     A bullet camera was sent down to locate the stuck plummet on June 4, 2012. Video from this camera showed waste in the annulus. Without further investigation, a new ENRAF instrument was installed in July of 2012, and after four months of no ENRAF monitoring, the new ENRAF instrument was activated.

51.     During this time, Defendants delayed routine video examination of AY-102. The videotaping, originally scheduled for June, was delayed by Defendants until August in order to allow Defendants to perform and bill for work with significant performance-based incentive ("PBI") value.

52.     On August 1, 2012, video examination began on the AY-102 annulus. Camera operators exclaim, "Holy shit! That's green slimy waste."

53.     Following videotape evidence of the leak, a Leak Assessment Team was put together. This team involved no employee who had previously evaluated and reported the leak, including Relator Geffre.

54.     In late August of 2012, during a Stewards Meeting in which Defendants' employees were permitted to ask questions, Relator Geffre asked one of the WRPS Vice Presidents something along the lines of "now that we have

video evidence of AY-102 leaking, what are we going to do about it?" Defendants' supervisor answered something similar to:

> We have not fully determined at this time if it is actually waste from the tank. We will be performing samples of the material soon. What we are mainly focused on at this time is meeting our PBI milestones [of October 1, 2012] and continuing our retrieval of C farm waste. It's important that we keep our customers and our shareholders happy.

55.     On August 24, 2012, possible tank waste material was again seen during a visual inspection of the annulus of AY-102. Defendants failed to disclose to DOE the longstanding leaking concerns of Relator Geffre and other Defendants' employees. Instead, Defendants told DOE that the tank was in stable condition.

56.     By the close of the fiscal year, September 30, 2012, Defendants had submitted documentation to obtain payment for Award Fee Performance Measures and Performance Based Incentives tied to, or impacted by, Tank AY-102.

57.     The Leak Assessment Team completed the assessment of AY-102 and, in October 2012, after the close of the fiscal year and after the submission of performance awards, Defendants disclosed to DOE that the inner shell was leaking waste into the annulus.

58.     Within days, DOE directed Defendants to complete an extent of condition review, including quickly expanding visual inspections of six other tanks that have similar construction with operating and process histories.

59.     On November 7, 2012, Defendants issued the "Tank 241-AY-102 Leak Assessment Report," containing the opinions and conclusions of Defendants concerning the AY-102 leak.   This report contained numerous material misrepresentations and omissions concerning Defendants' knowledge of the leak, including, but not limited to:

a.     Defendants misrepresented the cause of the October 2011 ENRAF alarm as inspection anomalies;

b.     Defendants misrepresented that studies confirmed the possibility that seasonal moisture accumulation and evaporation occurs in the annulus to the extent sufficient to trip an ENRAF alarm;

c.     Defendants reduced the RO-20 readings of October of 2011;

d.     Defendants omitted October 2011 ENRAF instrument reading of 0.51 inch;

e.     Defendants omitted the October 2011 visual confirmation of waste on the plummet;

f.     Defendants omitted the March 2012 plummet wire mrem readings;

g.    Defendants omitted the June 2012 visual confirmation of waste from the bullet camera;

h.    Defendants misrepresented that the August of 2012 inspection camera had no contamination—the camera was covered with a protective sleeve;

i.    Defendants misrepresented that previous inspections had not detected contamination;

j.    Defendants misrepresented the reliability and operability of other detection devices, such as the CAM; and

k.    Defendants generally misrepresented the timing and extent of the Tank AY-102 leak.

60.    Despite Defendants knowledge of the leak, Defendants continued to charge the United States for work related to the upgrade of Tank AY-102.    In December of 2012, DOE issued a Stop Work Order, prohibiting any further upgrade design work on AY-102.    Defendants continued charge the United States for such work well into 2013.

61.    Even after acknowledging the leak, Defendants continued to misrepresent to DOE its severity.    For instance, despite video inspections showing otherwise, Defendants told DOE that AY-102 leak was not getting bigger.

62.    On June 20, 2013, Defendants and DOE confirmed that AY-102 had leaked beyond its first and second shells.

**V.    COUNT I - False Claims Act, 31 U.S.C. § 3729 (a)(1) & (2)**

63.    Relator incorporates by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

64.    Defendants by and through their officers, agents, and employees, knowingly submitted or caused to be submitted, false or fraudulent claims for payment or approval to officers, employees, or agents of the United States Government in violation of 31 U.S.C. § 3729 (a)(1).

65.    Defendants by and through their respective officers, agents, and employees, knowingly made, used, or caused to be made or used, false records or statements to obtain United States payment of false or fraudulent claims in violation of 31 U.S.C. § 3729 (a)(2).

66.    The claims were false because Defendants claimed to the United States that Tank AY-102 was stable, without issue, and usable as part of the overall WTP vitrification process when that statement was false and Defendants knew, or should have known, it was false.

67.    Each of the false statements made in each false claim to the United States or to another contractor had the potential to influence the United States' decision whether to pay the claim.

68.    Every request for payment by Defendants to DOE with respect to the upgrade of AY-102, including work related to AY-102 design, infrastructure, construction and procurement, in which Defendants knew, or should have known, that Tank AY-102 was leaking waste constitutes a false claim.

69.    Every request for performance based award payment by Defendants to DOE related to nuclear safety, environment, radiological safety, work control process and control of operations, emergency preparedness, among others, and affected by Defendants misrepresentations and omissions to DOE concerning its knowledge of the leaking Tank AY-102 constitutes a false claim.

70.    As such, the United States has been damaged as result of Defendants' violations of the False Claims Act.

## VI.    COUNT II - False Claims Act, Conspiracy

71.    Relator incorporates by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

72.    Defendants entered into tacit and explicit agreements pursuant to which, *inter alia*, WRPS supplied and DOE accepted, false documents and designs and reports for which WRPS was paid as though they were conforming and so represented to the United States.

73.    Defendants conspired to defraud the United States in violation of the False Claims Act, 31 U.S.C. § 3729(c).

74.    As such, the United States has been damaged as a result of Defendants' violations of the False Claims Act.

## VII.    DAMAGES

75.    Relator incorporates by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

76.    Defendants knowingly made false statements and submitted false records to secure approvals of its false claims and monies to which it is not entitled, and their violations warrant restitution of monies they fraudulently obtained or monies to repair problems resulting from Defendants' falsities.

77.    Upon information and belief, the amount of monies fraudulently obtained is in excess of $20 million.

78.    The United States is likewise entitled to recover treble damages.

79.    Additionally, Defendants are liable for civil penalties prescribed by 43 U.S.C. § 1350.

## VIII.    JURY REQUEST

80.    Plaintiffs request a trial by jury.

## IX.    PRAYER FOR RELIEF

81.    WHEREFORE, Plaintiff, United States, through Relator, request the Court enter the following relief:

a.     That Defendants be ordered to cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

b.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.     That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

d.     That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

e.     That Relator recovers such other relief as the Court deems just and proper.

All of which is respectfully submitted,

   s/ Richard C. Eymann
Richard C. Eymann, WSBA #7470
EYMANN ALLISON HUNTER JONES P.S.
2208 W. Second Avenue
Spokane, Washington 99201
Telephone:  (509) 747-0101
Facsimile:    (509) 458-5977
E-mail:  eymann@eahjlaw.com


Hugh P. Lambert (*Pro Hac Vice* application anticipated)
Emily C. Jeffcott (*Pro Hac Vice* application anticipated)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

Cayce C. Peterson (*Pro Hac Vice* application anticipated)
THE LAMBERT FIRM, PLC
701 Magazine Street
New Orleans, Louisiana 70130
Telephone:  (504) 581-1750
Facsimile:    (504) 529-2931
E-mail:        hlambert@thelambertfirm.com
                  ejeffcott@thelambertfirm.com
                  cpeterson@thelambertfirm.com

*Attorneys for Relators*